## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

CRIMINAL CASE NO.

1:13-CR-181-TCB-RGV

MARCUS GRAY

## MAGISTRATE JUDGE'S REPORT AND
## RECOMMENDATION ON DEFENDANT'S PRETRIAL MOTIONS

Defendant Marcus Gray ("Gray") is charged in a two-count indictment with knowingly possessing a firearm after a felony conviction, in violation of 18 U.S.C. § 922(g), and knowingly failing to register as a sex offender after traveling in interstate commerce as required by the Sex Offender Registration and Notification Act ("SORNA"), 42 U.S.C. § 16901, et seq., in violation of 18 U.S.C. § 2250. [Doc. 1].[1] Gray has moved to suppress evidence and his statements, [Docs. 10 & 11], and following an evidentiary hearing on July 18, 2013,[2] the parties filed post-hearing

---

[1] The listed document and page numbers in citations to the record in this Report and Recommendation refer to the document and page numbers shown on the Adobe file reader linked to the Court's electronic filing database, CM/ECF, except that citations to deposition transcripts are cited according to the transcript page number.

[2] See [Doc. 21] for the transcript of the evidentiary hearing. Citations to the evidentiary hearing transcript hereinafter will be referred to as "(Tr. at ___)." In addition, the parties submitted exhibits at the hearings, which will be referred to as

briefs on the motions, [Docs. 23, 24, & 25 ].[3]   For the following reasons, it is **RECOMMENDED** that Gray's motions to suppress evidence and statements, [Docs. 10 & 11], be **DENIED**.

## I.  STATEMENT OF FACTS

On March 22, 2013, the United States Marshals Service ("USMS") received a "Crime Stoppers"[4] tip stating that Gray was wanted out of Lake County, Florida, as an unregistered sex offender and that he was currently living in the Atlanta area. (Tr. at 5-7).  The tip was routed to Inspector Erik Richmond ("Inspector Richmond") in the Sex Offender Investigations Branch of the USMS in Atlanta.  (Tr. at 4-5).  The tip was "very detailed" in that it described the residence in which Gray was living, the persons with whom he was residing, and his daily activities and acquaintances. (Tr. at 6-8).  Specifically, the tip indicated that Gray was living in unit 403 of an apartment complex located at 2475 Old Hapeville Road, and that he resided there with his cousin, Cassandra Lawrence ("Lawrence"), along with her three children,

_____

"(Gov. Ex. ___)," for the government's exhibits, and "(Def. Ex. ___)" for Gray's exhibits.

[3] After filing his initial post-hearing brief, [Doc. 23], Gray filed a "Corrected Post-Hearing Brief," [Doc. 24].  Thus, this Report and Recommendation will cite to Gray's "corrected" post-hearing brief, [Doc. 24].

[4] Crime Stoppers is a hotline through which callers anonymously provide information about fugitives.  (Tr. at 5).   This information is then routed to the appropriate law enforcement agency in the relevant jurisdiction.  (Id.).

two of her sister's children, and several other unidentified individuals.  (Tr. at 6-7).

Inspector Richmond contacted Lake County, Florida, to verify the information

contained in the tip and was informed that there was an outstanding arrest warrant

for Gray issued on December 28, 2011, for failure to register as a sex offender.  (Tr.

at 8-9; Gov. Ex. 2).  Sometime between March 22 and April 11, 2013, Inspector

Richmond obtained a Florida driver's license photograph of Gray from the Florida

Department of Motor Vehicles.  (Tr. at 9; Gov. Ex. 1).

At about 11:00 a.m. on April 11, 2013, Inspector Richmond, accompanied by

Task Force Officer Garland ("Officer Garland"), went to the apartment complex

mentioned in the tip to verify that Gray was living at the premises.  (Tr. at 10, 43-44).

Inspector Richmond and Officer Garland approached the apartment's leasing

manager and asked her if she recognized Gray from the photograph taken from his

driver's license.  (Tr. at 11, 44; Gov. Ex. 1).  The leasing manager immediately

recognized Gray from this photograph and indicated that he lived in unit 403,

together with Lawrence and "a lot" of other people.  (Tr. at 11-13, 44, 47).  She stated

that she had seen Gray on the premises about 20 minutes ago and believed that he

was presently in the unit.  (Tr. at 11).  She further described the type of clothing Gray

was wearing and explained the layout of the apartment, noting that, in addition to

the front door, the unit had a back porch adjacent to a woodline.  (Tr. at 11-12, 16-17;

Def. Exs. 5 & 7).

Inspector Richmond drove by the unit to investigate and called for backup in

order to make an arrest.  (Tr. at 13).  While observing the unit, Inspector Richmond

and Officer Garland noticed a number of individuals "coming in and out" and

sitting on the stairwell adjacent to the apartment.  (Tr. at 15, 45; Def. Ex. 10; Gov. Exs.

3 & 4).  At that point, Inspector Richmond left the complex and drove to the parking

lot of a nearby McDonald's restaurant to await other law enforcement agents, while

Officer Garland remained on the premises to watch the unit.  (Tr. at 15, 45).  While

Inspector Richmond was meeting with the other agents at McDonald's, Officer

Garland observed two individuals exit the unit and sit down in the stairwell.  (Tr.

at 15).  Officer Garland notified Inspector Richmond that one of these individuals

appeared to be Gray.  (Id.).

About 20 minutes after Inspector Richmond had left the apartment complex,

he returned to the apartment with approximately 10 more law enforcement agents.

(Tr. at 16, 45-46, 74).  Upon their arrival, some of the agents began to approach the

front of the unit, while Inspector Richmond and another agent proceeded to the back

of the unit.  (Tr. at 17, 49).  Before the agents reached the front door, the door opened

and several individuals, including two adult males, started coming out.  (Tr. at 48,

6

71, 76, 90, 94-95, 106).[5]  Some of the agents remained with these individuals at the front of the unit to question them, (Tr. at 76), while the other agents entered through the front door in a single-file line, commonly referred to as a "stack," (Tr. at 75-76, 89).

Inspector Richmond, still at the back of the unit, heard the agents at the front of the apartment directing people to show their hands and get on the ground.  (Tr. at 17).  Inspector Richmond also heard an adult female voice in the front yelling that there were cops and SWAT teams "all over the place."  (Id.; Tr. at 48, 71-72).  As Inspector Richmond drew closer to the back porch, he clearly heard people talking inside.  (Tr. at 17-18, 49; Def. Ex. 6).  Within 10 seconds after he reached the back of the unit, Inspector Richmond looked through an open bedroom window and observed Gray lying on a bed.  (Tr. at 18, 48-49; Gov. Ex. 5; Def. Exs. 1 & 6).  Inspector Richmond immediately recognized Gray from his photograph. (Tr. at 19, 49; Gov. Ex. 1).  Inspector Richmond pointed his firearm at Gray through the open window and ordered him not to move.   (Tr. at 18, 21, 49, 52).   He then communicated to the other agents by radio that he had located Gray in the back bedroom.  (Tr. at 18, 50).

---

[5] In all, there were five adults and a number of children inside the residence when the agents entered.  See (Tr. at 120-21).

A few minutes later, several agents who had entered through the front of the unit came to the bedroom where Gray was located.  (Tr. at 19, 50-51, 85).  Special Agent James Taylor Booth, Jr. ("Agent Booth"), of the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), immediately placed Gray in handcuffs, while Officer Jeffery M. May ("Officer May") proceeded to scan the bedroom to ensure that no one else was concealed in the room.  (Tr. at 20, 51, 78, 86, 96, 110).  Officer May first turned to an open closet that was large enough to conceal a person and that contained various articles of clothing on hangers and strewn about the floor.  (Tr. at 51, 78, 81, 88-89; Gov. Exs. 6 & 7); see also (Tr. at 55-56).  Without touching the closet door or anything inside of the closet, Officer May immediately recognized a firearm on the closet shelf, which was situated at eye level.  (Tr. at 78-80, 82, 98; Gov. Exs. 8 & 9).  Officer May announced that there was a firearm and then proceeded to "sweep" the closet, in a matter of seconds, by pushing his hand through the clothing towards the wall and using his foot to move aside the clothing on the floor, in order to ensure that no one was in the closet.  (Tr. at 80-81, 88, 91, 96, 111).[6]  After the

---

[6] Officer May testified that he "moved to [the closet] to make sure that there [were] no threats in[side]," meaning "anybody else that might have been in the house that may have decided to hide there."  (Tr. at 78).

premises were secured, Agent Booth removed the gun from the closet, safety strapped it, and placed it into an evidence box.  (Tr. at 96-97, 109).[7]

Gray was removed from the residence and secured in the front passenger seat of Inspector Richmond's vehicle. (Tr. at 22, 52-53).  Inspector Richmond approached Gray and read him his Miranda[8] rights from a USMS Miranda rights card. (Tr. at 23-24, 60-61; Gov. Ex. 10).  Gray indicated that he understood his rights and told Inspector Richmond that he was willing to talk to him.  (Tr. at 24).  Inspector Richmond began questioning Gray concerning his failure to register as a sex offender and his recent travel from Florida to Atlanta.  (Tr. at 24-26, 60-61).  Inspector Richmond told Gray that another agent from the ATF would probably come over to talk to him about  something they had found in his room.  (Tr. at 25, 62).

When Inspector Richmond had finished questioning Gray, he asked him if he would be willing to provide a written statement.  (Id.).  Gray responded that he would be willing to give a written "statement . . . about . . . the sex offender violations," but that he would not "put anything about the gun in writing."  (Tr. at 61-63); see also (Tr. at 25-26).  As people began congregating near the vehicle, Gray

---

[7] Agent Booth also removed a single bullet which he found in the gun.  (Tr. at 109).

[8] Miranda v. Arizona, 384 U.S. 436 (1966).

stated that he would like to give his statement in a different location where he could be alone.  (Tr. at 26); see also (Tr. at 65-66).

Shortly thereafter, Agent Booth told Inspector Richmond that he would like to speak with Gray.  (Tr. at 61, 99).  Agent Booth also verified with Inspector Richmond that Gray had already been advised of his Miranda rights.  (Id.).  He then approached Gray, who was still seated in the front passenger seat of Inspector Richmond's vehicle, and asked him if he had been read his rights.  (Tr. at 27, 61, 99-100).  Gray replied in the affirmative and said that he would like to speak with the agents.  (Tr. at 99-100).  Agent Booth then asked Gray if he was willing to give a written statement about the gun that had been found in his room.  (Tr. at 26, 61-63).  Gray replied that he was willing to speak with Agent Booth about the gun, but said that he would not provide a written statement about it.  (Tr. at 26, 62-63, 100-01).  After Agent Booth had questioned Gray about the gun for around five minutes, Gray stated that he did not want to talk around the apartment any more because there were a lot of people watching, but that he was willing to continue talking with the agents in a different location.  (Tr. at 26, 65-66, 100, 113).  Inspector Richmond then transported Gray to a loading dock area behind an abandoned K-Mart building near the apartment complex.  (Tr. at 29, 66-67, 101).  Agent Booth and Officer Garland each followed behind in separate vehicles.  (Tr. at 29-30, 101).

10

Upon their arrival, Gray remained seated in the passenger compartment while Inspector Richmond opened the passenger door and, along with Agent Booth, approached Gray from outside the vehicle. (Tr. at 68).[9] Gray did not object to the new location. (Tr. at 29). Inspector Richmond again advised Gray of his <u>Miranda</u> rights and asked him if he would be willing to sign a waiver-of-rights form. (<u>Id.</u>; Tr. at 101). Gray agreed to sign the form. (Tr. at 30, 68; Gov. Ex. 11). After Inspector Richmond uncuffed Gray and read the form to him, Gray reviewed the waiver form and signed it. (Tr. at 31-33, 68). Gray then provided a written statement concerning his failure to register as a sex offender. (Tr. at 31-33, 68-69, 102; Gov. Ex. 12). About five or ten minutes after Gray had completed his statement, Agent Booth began questioning him concerning the firearm and asked him if he were willing to provide a written statement. (Tr. at 34, 69, 102-03). Gray again reiterated that he would tell Agent Booth whatever he wanted to know about the gun, but that he would not put anything about the gun in writing. (Tr. at 69, 102-03).[10] Agent Booth then proceeded

---

[9] Officer Garland "never [] left his vehicle," which was parked about 20 to 30 feet away from Gray. (Tr. at 30, 68).

[10] Inspector Richmond further testified that "[Gray] was absolutely willing to make a statement [about the gun]. He just wasn't willing to put it in writing. . . . [H]e said, . . . . I'll tell you whatever you want to know verbally about the sex offender case and the gun case, but I'm only going to put the sex offender stuff in writing. I'm not going to put the gun stuff in writing." (Tr. at 69). <u>See also</u> (Tr. at 34 (internal marks added) (After "Agent Booth . . . told . . . [Gray] . . . that [they] had found the firearm in his bedroom[,] [Gray] acknowledged that it was his firearm,

to question Gray for about 10 to 15 minutes after confirming with him once more that he was willing to speak with him about the firearm.[11]  (Tr. at 34-35, 100-03). Inspector Richmond then placed Gray in handcuffs and transported him to the Fulton County Jail.  (Tr. at 35).

## II.  DISCUSSION

Gray moves to suppress any evidence concerning the gun that was seized at the time of his arrest and any statements he made "with respect to the gun."  [Doc. 24 at 17].  Gray argues that the seizure of the gun was unlawful because it was not justified by any exceptions to the Fourth Amendment's warrant requirement, [id. at 9-16], and that his statements were obtained in violation of his Fifth Amendment right to remain silent, [id. at 16-17].  In response, the government contends that the gun was lawfully seized while located in plain view during a legally permissible protective sweep, [Doc. 25 at 6-20], and that Gray's statements concerning the gun are admissible because he waived his right to remain silent, [id. at 20-25].

---

and [] told Agent Booth . . . where he had gotten the gun[ and] how long he'd had it[.]  Then Agent Booth asked him if he would sign a written statement [and Gray] said, 'I'm not writing anything about a gun.'")).

[11] Specifically, after Gray said, "'No,' he would not give a written statement concerning the firearm," Agent Booth asked him, "[W]ill you still talk to me, or does 'No' mean you don't want to give any statement or just a written statement?"  (Tr. at 102-03) (first set of internal marks added).  Gray replied, "I'll still talk to you." (Tr. at 103).

### A.     Motion to Suppress Evidence

Gray asserts that none of the established exceptions to the warrant requirement authorized the seizure of the gun in this case.  [Doc. 13 at 9-16].  In particular, Gray argues that , "[w]hile [the protective sweep doctrine] may have justified a cursory look into the closet in the bedroom where [Gray] was arrested," it did not justify the seizure of the gun once it was found.  [Id. at 13].  Gray further contends that "the plain view doctrine did not justify the seizure of the [gun ] because the incriminating nature of the [gun] was not immediately apparent."  [Id.].

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. Amend. IV.  Consequently, "a search or seizure must normally be conducted under the authority of a court-issued warrant, supported by a finding of probable cause to believe that evidence of a crime will be found in the targeted location."  United States v. Cruz, Criminal Action No. 1:11–CR–0377–WSD–CCH, 2012 WL 1564671, at *5 (N.D. Ga. Mar. 19, 2012), adopted by 2012 WL 1564667, at *3 (N.D. Ga. Apr. 30, 2012) (citing Skinner v. Ry. Labor Executives' Ass'n, 489 U.S. 602, 619 (1989); Mincey v. Arizona, 437 U.S. 385, 390 (1978)).  Warrantless "searches and seizures inside a home . . . are presumptively unreasonable," United States v. Bervaldi, 226 F.3d 1256, 1262-63 (11th Cir. 2000) (citing Payton v. New York, 445 U.S.

13

573, 586, 603 (1980)), subject only to "a few specifically established and well-delineated exceptions," <u>Mincey</u>, 437 U.S. at 390 (<u>quoting</u> <u>Katz v. United States</u>, 389 U.S. 347, 357 (1967)).  "Under the doctrine commonly known as the exclusionary rule, evidence is inadmissible if it is obtained through a search and seizure that is conducted without a warrant and is not subject to one of the specific exceptions to the warrant requirement."  <u>Cruz</u>, 2012 WL 1564671, at *5 (<u>citing</u> <u>Mapp v. Ohio</u>, 367 U.S. 643, 655 (1961)).  Since a warrantless search or seizure is presumptively invalid, the government bears the burden of establishing by a preponderance of the evidence that a particular exception to the warrant requirement applies.  <u>Michigan v. Tyler</u>, 436 U.S. 499, 509 (1978); <u>Vale v. Louisiana</u>, 399 U.S. 30, 34 (1970).

One such exception is the "plain view" doctrine.  Under the plain view doctrine, government agents may seize an object without a warrant provided that three conditions are satisfied: "(1) an officer is lawfully located in the place from which the seized object could be plainly viewed; (2) the officer has a lawful right of access to the object itself; and (3) the incriminating character of the item is immediately apparent."  <u>United States v. Anyanwu</u>, Criminal File No. 1:12–CR–190–TWT, 2013 WL 3283748, at * 5 (N.D. Ga. June 28, 2013), adopted at *1 (<u>citing</u> <u>Horton v. California</u>, 496 U.S. 128, 136-37 (1990); <u>United States v. Smith</u>, 459 F.3d 1276, 1290 (11th Cir. 2006)).  The theory of the plain view doctrine is that "if

contraband is left in open view and is observed by a police officer from a lawful vantage point, there has been no invasion of a legitimate expectation of privacy and thus no 'search' within the meaning of the Fourth Amendment–or at least no search independent of the initial intrusion that gave the officers their vantage point." Minnesota v. Dickerson, 508 U.S. 366, 375 (1993) (citations omitted).   Upon considering the evidence and the briefs of the parties, the Court concludes that the seizure of the gun satisfied each of the three conditions of the plain view doctrine, and for the following reasons, it is **RECOMMENDED** that Gray's motion to suppress evidence, [Doc. 10], be **DENIED**.

1.   *Lawful Vantage Point*

While warrantless searches and seizures inside a private residence are presumptively unreasonable, "the Supreme Court [in Payton] held that for Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within."   Bervaldi, 226 F.3d at 1262-63 (citation and internal marks omitted).   Elaborating on this principle, the Eleventh Circuit has held that "*Payton* requires a two-part inquiry to determine if entry pursuant to an arrest warrant complies with the Fourth Amendment's proscription of unreasonable searches."   Id. at 1263 (citing United States v. Magluta, 44 F.3d 1530,

1533 (11th Cir. 1995)). First, there must be a reasonable belief that the location to be searched is the suspect's dwelling; and second, the agents must have "reason to believe" that the suspect is within the dwelling at the time of entry. Id. (citation and internal marks omitted).[12]  In short:

> [F]or law enforcement officials to enter a residence to execute an arrest warrant for a resident of the premises, the facts and circumstances within the knowledge of the law enforcement agents, when viewed in the totality, must warrant a reasonable belief that the location to be searched is the suspect's dwelling, and that the suspect is within the residence at the time of entry.

United States v. Baker, No. 5:13–CR–9 (MTT), 2013 WL 4434955, at *4 (M.D. Ga. Aug. 14, 2013) (citation and internal marks omitted) (quoting Bervaldi, 226 F.3d at 1263). The Court's inquiry is guided by common sense factors as to both prongs of the Payton analysis. Bervaldi, 226 F.3d at 1263.

In this case, the agents had a valid arrest warrant for Gray, (Tr. at 8-9; Gov. Ex. 2), and therefore could enter unit number 403 on 2475 Old Hapeville Road if they

---

[12] The Eleventh Circuit has held that "reasonable belief is different than probable cause," Bervaldi, 226 F.3d at 1265 (citing Magluta, 44 F.3d at 1534-35), and several other circuits have reached a similar conclusion, see United States v. Thomas, 429 F.3d 282, 286 (D.C. Cir. 2005); Valdez v. McPheters, 172 F.3d 1220, 1225-26 (10th Cir. 1999); United States v. Route, 104 F.3d 59, 62 (5th Cir. 1997); United States v. Risse, 83 F.3d 212, 216 (8th Cir. 1996); United States v. Lauter, 57 F.3d 212, 215 (2d Cir. 1995). However, the Ninth Circuit and the Sixth Circuit, in dicta, have equated the reasonable belief standard to probable cause. United States v. Hardin, 539 F.3d 404, 416 n.6 (6th Cir. 2008); United States v. Gorman, 314 F.3d 1105, 1110 (9th Cir. 2002). The Court will apply the "reason to believe" standard consistent with Eleventh Circuit precedent.

16

had reason to believe that it was Gray's residence and that he was home at the time of entry.  See Magluta, 44 F.3d at 1533-34.  The evidence here establishes that the agents reasonably believed that the apartment in question was Gray's dwelling at the time of entry.  The agents received a "very detailed" tip that provided Gray's exact address, the persons with whom he was residing, including his cousin Lawrence, and information about his daily activities and acquaintances.  (Tr. at 6-8).  The tip further provided specific information concerning the warrant for Gray's arrest, including its county of issue and the underlying crime, (Tr. at 5-7), which was subsequently verified by Inspector Richmond when he contacted Lake County, Florida, (Tr. at 8-9).  Next, when Inspector Richmond and Officer Garland presented a reliable photograph of Gray, taken from his Florida driver's license, to the leasing manager of the apartment complex described in the tip, the manager immediately recognized Gray from his photograph and stated that he resided in apartment 403.  (Tr. at 11-13).  The manager also confirmed that Gray was residing with Lawrence and several other individuals.  (Id.; Tr. at 44, 47).

The evidence also supports a finding that the agents reasonably believed that Gray was inside the apartment at the time of entry.  The leasing manager informed Inspector Richmond and Officer Garland that she had seen Gray walking along the property just 20 minutes prior to the agents' arrival, and she believed  that Gray was

presently inside the apartment. (Tr. at 11). In addition, while Inspector Richmond left the scene to await other agents, Officer Garland thought that he observed Gray sitting in the apartment's stairwell and he communicated this information to Inspector Richmond. (Tr. at 15, 45). For these reasons, the Court concludes that "'the facts and circumstances within the knowledge of the . . . agents, when viewed in the totality,' warranted a reasonable belief as to [Gray's] residence and presence." United States v. Bellamy, 456 F. App'x 863, 865 (11th Cir. 2012) (per curiam) (unpublished) (quoting Magluta 44 F.3d at 1535). Accordingly, because the agents were lawfully located in the place from which the gun was seized, the first criterion of the plain view doctrine is satisfied. See United States v. Acosta, 807 F. Supp. 2d 1154, 1260-61 (N.D. Ga. 2011) (citation and internal marks omitted) ("Because the entry was permitted under Payton, the seizure of the evidence in plain view was also permissible.").

### 2. *Lawful Right of Access*

Once the agents "possessed this valid justification to enter the residence[,] they were entitled, pursuant to Maryland v. Buie . . . to engage in a protective sweep of the premises." Acosta, 807 F. Supp. 2d at 1260 (first alteration in original) (citations and internal marks omitted). And contrary to Gray's argument that a protective sweep may not be used to justify the seizure of contraband observed in

18

plain view, see [Doc. 24 at 13], it is well-settled that government agents have a lawful right of access to seize evidence that is discovered in plain view in the course of a valid protective sweep, Acosta, 807 F. Supp. 2d at 1260-61 (citations omitted); see also United States v. Wright, 324 F. App'x 800, 804 (11th Cir. 2009) (per curiam) (unpublished) (second alteration in original) (citing United States v. Hromada, 49 F.3d 685, 690 (11th Cir. 1995) ("Within the proper scope of a protective search, an [agent] is entitled to 'seize any evidence . . . discovered in plain view.'").  A protective sweep is "a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others[,]" and is "narrowly confined to a cursory visual inspection of those places in which a person might be hiding." Maryland v. Buie, 494 U.S. 325, 327 (1990).[13]

The Buie Court identified two types of protective sweeps.  See United States v. Mayo, 792 F. Supp. 768, 773 (M.D. Ala. 1992).  First, incident to an in-home arrest, officers may "as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest

---

[13] Other Courts, including the Eleventh Circuit, have "expanded Buie beyond in-home arrests pursuant to a warrant to all situations wherein officers are lawfully present in a home."  United States v. Legette, 260 F. App'x 247, 249-50 (11th Cir. 2008) (per curiam) (unpublished) (citations omitted).  See also Cruz, 2012 WL 1564671, at *6 (citing United States v. Carabollo, 595 F.3d 1214, 1224 (11th Cir. 2010); United States v. Miller, 430 F.3d 93, 99 (2d Cir. 2005); United States v. Martins, 413 F.3d 139, 150 (1st Cir. 2005)).

from which an attack could be immediately launched." <u>Buie</u>, 494 U.S. at 334.  This

has been characterized as a type-one <u>Buie</u> search.  <u>See</u> <u>Cruz</u>, 2012 WL 1564671, at *6

(<u>citing</u> <u>United States v. Sunkett</u>, 95 F. Supp. 2d 1367, 1368 (N.D. Ga. 2000)).  Second,

a more extensive search is permitted if there are "articulable facts which, taken

together with the rational inferences from those facts, would warrant a reasonably

prudent officer in believing that the area to be swept harbors an individual posing

a danger to those on the arrest scene."  <u>Buie</u>, 494 U.S. at 334.  This has been

characterized as a type-two <u>Buie</u> search.  <u>See</u> <u>Cruz</u>, 2012 WL 1564671, at *6 (<u>citing</u>

<u>Sunkett</u>, 95 F. Supp. 2d at 1368).

      The government argues that the agents' protective sweep of the closet was

a "permissible type one <u>Buie</u> sweep because the closet was adjoining the room in

which the arrest occurred and the search was cursory."  [Doc. 25 at 10].  The Court

agrees.  Indeed, Officer May's protective sweep of the closet is a text-book example

of a permissible type-one <u>Buie</u> search.  While Gray was being placed under arrest

in the bedroom, Officer May scanned the room for potential "threats" to officer

safety.  (Tr. at 78).  Officer May first turned his attention to an open closet that was

large enough to conceal a person and that was crowded with clothing hanging from

the top of the closet and scattered about the floor.  (Tr. at 51, 78, 81, 88-89; Gov. Exs.

6 & 7).  He immediately saw at eye level a firearm on the closet shelf.  (Tr. at 78-80,

82, 98; Gov. Exs. 8 & 9).   Officer May then announced "firearm" and quickly searched the closet for persons by pushing his hand through the hanging clothing towards the wall and by using his foot to brush aside the clothing on the floor–all in a matter of seconds.   (Tr. at 80-81, 88, 91, 96, 111).   The sweep was therefore a permissible type-one Buie search that did not require probable cause or reasonable suspicion because it was conduced in a "closet . . .  immediately adjoining the place of arrest from which an attack could be immediately launched," Buie, 494 U.S. at 334, and because it was exceedingly brief and was limited to those places where a person could hide, see Hromada, 49 F.3d at 690; Sunkett, 95 F. Supp. 2d at 1369 (brief, limited search of bedroom closet, whose door was ajar, was a reasonable type-one Buie search where officers looked only in places where a person could hide and found weapons in plain view); United States v. Diaz-Garcia, 808 F. Supp. 784, 789 (S.D. Fla. 1992).[14]

Accordingly, Officer May had a legitimate right of access to the firearm because he observed it in plain view during a lawful protective sweep, and the second condition of the plain view doctrine is therefore satisfied.   See Georgia v. Randolph, 547 U.S. 103, 1536-37 (2006) (citation omitted) (where "police [are]

_____

[14] The government also contends that the sweep of the closet may be independently justified as a type-two Buie search, [Doc. 25 at 10], but the Court need not address this argument since there is a sufficient factual basis on which to justify the sweep of the closet as a type-one Buie search.

lawfully in the premises, there is no question that they [may] seize any evidence in plain view or take further action supported by any consequent probable cause"); Hromada, 49 F.3d at 690 (citation omitted) ("The agents were free to seize any evidence they discovered in plain view within the proper scope of the protective sweep."); United States v.Tobin, 923 F.2d 1506, 1513 (11th Cir. 1991) (citation omitted) (same); United States v. Rodgers, 924 F.2d 219, 221 (11th Cir. 1991) (citation omitted) ("The plain view doctrine allows police officers to seize any contraband in plain view if the officers have a right of access to the place where the contraband is located."); United States v. Caraza, 843 F.2d 432, 435 (11th Cir. 1988) (per curiam) (citation omitted) ("If officers spot evidence in plain view during [] a protective sweep, they may seize it.").

### 3.    *Immediately Apparent Incriminating Character*

Gray argues that the incriminating character of the firearm was not immediately apparent, and that the seizure of the firearm was not therefore justified based on probable cause.  [Doc. 24 at 13].  "For an item's incriminating character to be 'immediately apparent,' the police merely need probable cause to believe that the item is contraband."  United States v. Simpson, 259 F. App'x 164, 167 (11th  Cir. 2007) (per curiam) (unpublished) (citation omitted).  See also United States v. Ochoa, 402 F. App'x 478, 484 (11th Cir. 2010) (per curiam) (unpublished).  "[P]robable cause

'merely requires that the facts available to the officer would warrant a man of reasonable caution in the belief . . . that certain items may be contraband.'" United States v. O'Campo, 381 F. App'x 974, 977 (11th Cir. 2010) (per curiam) (unpublished) (second alteration in original) (quoting Texas v. Brown, 460 U.S. 730, (1983)).

Upon review of the record, the Court finds that the incriminating character of the gun was immediately apparent. Prior to the discovery of the gun, the agents were aware that there was an outstanding warrant for Gray's arrest and that he was a previously convicted felon. (Tr. at 8-9, 74-75). Officer May observed the gun in plain view, at eye level, in an open closet during a lawful protective sweep. (Tr. at 78-80, 82, 98; Gov. Exs. 8 & 9). Officer May did not manipulate or disturb the firearm or any of the contents of the closet in order to observe the firearm; indeed, he did not even touch the closet or reach inside until after he had observed the firearm on the shelf and immediately announced "firearm." (Tr. at 78-82, 98). In light of these circumstances, an officer of reasonable caution could conclude that the firearm was contraband, and the third condition of the plain view exception is therefore satisfied. See United States v. Purcell, 236 F.3d 1274, 1277 (11th Cir. 2001) (citation omitted) (Agents "may seize any contraband, including weapons, in plain view."); United States v. Holt, No. 2:08-cr-38-FtM-29DNF, 2008 WL 5191472, at *5 (M.D. Fla. Dec. 10, 2008) (firearms observed under defendant's bed while officers looked for items

permitted by search warrant could be seized under plain view exception because officer knew defendant was convicted felon, and incriminating nature of firearms was thus immediately apparent); United States v. Ford, 56 F.3d 265, 270 (D.C. Cir. 1995) (finding agent lawfully seized gun clip observed in plain view and whose incriminating character was immediately apparent even though search under mattress or behind window shades exceeded scope of protective sweep).[15] Accordingly, because the seizure of the firearm in this case falls within the plain view exception to the warrant requirement, it is hereby **RECOMMENDED** that Gray's motion to suppress evidence, [Doc. 10], be **DENIED**.

---

[15] Gray presents several other arguments that are rendered moot by the Court's finding that the firearm was seized in plain view during a lawful protective sweep. Specifically, Gray argues that "seizure under a probable cause theory would have required the existence of exigent circumstances," which were absent in the circumstances presented here, [Doc. 24 at 14], and that the seizure cannot be justified as a search incident to arrest in light of the rationales espoused in Chimel v. California, 395 U.S. 752 (1969) and Arizona v. Gant, 556 U.S. 332 (2009), [id. at 14-16]. While exigent circumstances and searches incident to arrest are certainly recognized exceptions to the warrant requirement, they are not the only exceptions; and that the seizure in this case may not be justified under these particular exceptions does not preclude its independent justification on an alternative legal basis. The Court's finding that the seizure in question is justified under the plain view doctrine in conjunction with a valid protective sweep is in no way affected by the absence of additional justifications. Therefore, the Court will not further address these arguments.

**B.     Motion to Suppress Statements**

Following his arrest, Gray made a number of incriminating statements to the agents, see (Tr. at 25, 61, 70, 100, 103, 113; Gov. Ex. 12), which he now seeks to suppress, arguing that the statements were "extracted in violation of his right to remain silent," [Doc. 24 at 16].  Specifically, Gray asserts that he "unequivocally" invoked his right to remain silent "with respect to the gun," and that his incriminating statements concerning the gun were therefore obtained in violation of his Fifth Amendment rights under Miranda.  [Id. at 17].  The government contends that Gray never invoked the right to remain silent, and that he "knowingly and voluntarily waived his Miranda rights" prior to answering the agents' questions.  [Doc. 25 at 20-25].[16]

The government bears the burden of proving by a preponderance of evidence that Gray validly waived his Miranda rights.  United States v. Chirinos, 112 F.3d 1089, 1102 (11th Cir. 1997).  See also Colorado v. Connelly, 479 U.S. 157, 168-69 (1986).  In Miranda, the Supreme Court acknowledged that custodial interrogations, by their very nature, create "compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise

---

[16] It is undisputed that Gray was in custody at the time he made these statements, and that he was subjected to an "interrogation" by the agents after having been advised of his Miranda rights.  The issue presented is whether Gray invoked–or waived–the right to remain silent.

do so freely." 384 U.S. at 467. To address this inherent compulsion and protect a suspect's Fifth Amendment privilege against self-incrimination, Miranda established certain procedures which law enforcement officers must follow. Specifically, prior to the initiation of questioning, officers must fully advise the suspect of the government's intention to use his statements to secure a conviction, and must inform him of his rights to remain silent and to "have counsel present . . . if [he] so desires." Id. at 468-70. Miranda further requires that law enforcement respect the suspect's decision to exercise his rights as outlined in the warnings. "If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." Id. at 473-74 (footnote omitted). "If the individual states that he wants an attorney, the interrogation must cease until an attorney is present." Id. at 474.

A defendant may waive his rights if the waiver is made knowingly, intelligently, and voluntarily. Id. at 444. This inquiry has two distinct dimensions:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

United States v. Patterson, Criminal No. 1:06-CR-500-1-TWT, 2007 WL 2331080, at
*3 (N.D. Ga. Aug. 10, 2007), adopted at *1 (citation omitted) (quoting United States
v. Barbour, 70 F.3d 580, 585 (11th Cir. 1995)).  See also Moran v. Burbine, 475 U.S.
412, 421 (1986); Edwards v. Arizona, 451 U.S. 477, 482 (1981); Fare v. Michael C., 442
U.S. 707, 725 (1979).  "No single factor is necessarily determinative of the issue
whether a defendant knowingly and intelligently waived his rights but the court
must engage in a fact-specific inquiry based on all of the circumstances."  Patterson,
2007 WL 2331080, at *3 (citation omitted).  However, an express oral or written
waiver of Miranda is strong proof of the validity of the waiver.  United States v.
Stephens, 202 F. Supp. 2d 1361, 1370 (N.D. Ga. 2002).  To find a waiver involuntary,
coercion by law enforcement is a "necessary predicate," Connelly, 479 U.S. at 167,
and "in the absence of [such] coercion a court cannot conclude a defendant's waiver
or inculpatory statements are involuntary," United States v. Minard, 208 F. App'x
657, 660 (10th Cir. 2006) (unpublished).

 In this case, after Gray was detained, Inspector Richmond advised him of his
Miranda rights by reading the rights from a USMS Miranda rights card.  (Tr. at 23-
24, 60-61; Gov. Ex. 10).  Gray stated that he understood his rights and told Inspector
Richmond that he was willing to talk to him.  (Tr. at 24). Shortly afterwards, when
Agent Booth approached Gray to question him about the firearm, Gray

acknowledged that he had already been advised of his <u>Miranda</u> rights and said that he would speak with Agent Booth.  (Tr. at 99-100).  Gray was subsequently transported to a nearby location for further questioning at his own request.  (Tr. at 26, 65-66, 100, 113).  At no point did Gray object to the new location.  (Tr. at 29).  The agents then advised Gray of his <u>Miranda</u> rights for a second time, and he agreed to sign a waiver-of-rights form.  (Tr. at 29-30, 101).  Inspector Richmond uncuffed Gray, read the form to him, and allowed him to review it.  (Tr. at 31-33, 68).  Gray signed the form and continued to talk about the firearm with Agent Booth for another 10 to 15 minutes.   (<u>Id.</u>; Tr. at 34-35, 100-03).

Inspector Richmond and Agent Booth both testified that at no time did they make any threats or promises, or otherwise display any force to induce Gray to waive his rights.  (Tr. at 28, 104-05).  When Inspector Richmond explained the content of the rights, warning, and waiver to Gray, he did not ask for clarification, stop the interview, request counsel, or otherwise indicate in any way that he did not understand his rights or the consequences of his waiver.  (Tr. at 30-32, 105).  Gray was cooperative and compliant and his answers were responsive.  (Tr. at 28, 104-05).  On these facts, the government has shown that, under the totality of the circumstances, Gray was aware of the nature of his rights being abandoned and the

consequences of his decision to abandon them and that he knowingly and intelligently waived his <u>Miranda</u> rights.

Gray does not dispute that he waived his <u>Miranda</u> rights as to the statements he made concerning his failure to register as a sex offender. <u>See generally</u> [Doc. 24]. Instead, he argues that he "unequivocally invoked his right to remain silent with respect to the gun," and that, notwithstanding his "express[] . . . desire[]," Agent Booth continued to question him about the gun until he elicited incriminating statements. [<u>Id.</u> at 16-17]. In order to invoke the right to remain silent, "a suspect must articulate his desire to end questioning with sufficient clarity so that a reasonable police officer would understand that statement to be an assertion of the right to remain silent." <u>United States v. Mikell</u>, 102 F.3d 470, 477 (11th Cir. 1996) (citing <u>Coleman v. Singletary</u>, 30 F.3d 1420, 1424 (11th Cir. 1994)). "If the statement is ambiguous or equivocal, the police have no duty to clarify the suspect's intent, and they may proceed with the interrogation." <u>Id.</u> (citation omitted).

In support of his argument, Gray points to his refusal to make a written statement about the firearm and to an isolated statement in Inspector Richmond's testimony to the effect that "[Gray] said that he was not going to say anything about the gun[.]" [<u>Id.</u> at 16]; <u>see also</u> [<u>id.</u> at 7 (<u>citing</u> (Tr. at 63)]. However, it is undisputed that Gray initially waived his right to remain silent when he orally agreed to speak

with Inspector Richmond after being advised of his <u>Miranda</u> rights, <u>see generally</u> [Docs. 24 & 25], and taken in context, Inspector Richmond's testimony establishes only that Gray was unwilling to make a written statement about the gun, not that he was unwilling to speak about it verbally.   At no point during the agents' questioning did Gray state that he did not wish to speak anymore or otherwise unambiguously articulate a desire that questioning cease.   (Tr. at 28, 102, 104).

Indeed, Inspector Richmond, as well as Agent Booth, testified that Gray affirmatively agreed to speak about the gun on at least three occasions–twice at the apartment complex and once at the loading dock, <u>see</u> (Tr. at 25-26, 61-63, 100-01)–during the period in which he was questioned, <u>see</u> (Tr. at 63 ("I'm not going to say anything about [the gun]. . . . I'll tell you whatever you want to know, but I'm not going to write anything down."), 62 ("I'm not going to put anything about the gun in writing. . . . I'll talk to you.   I'm just not going to put it in writing."), 69 ([Gray] was "absolutely willing" to make a statement [about the gun].   He just wasn't willing to put it in writing."), 102-03 (Gray said "he would not give a written statement concerning the firearm[,]" but that he would "still talk" about it.)).   <u>See also</u> (Tr. at 34).

As evidence of his  purported invocation of the right to remain silent, Gray relies on his refusal to make a written statement about the gun.   <u>See</u> [Doc. 24 at 16].

30

Gray's reliance is misplaced.  Indeed, Gray's refusal to communicate about the gun in writing, coupled with his parallel and contemporaneous agreement to communicate about it orally, serve, through contrast, to underscore–rather than undermine–his manifest willingness to speak about the gun.  In short, the portions of the record relied upon by Gray in support of his argument show only that, if Gray was emphatic about his unwillingness to write about the gun, then he was just as emphatic about his willingness to speak about it.  See Mikell, 102 F.3d at 477 ("[A] suspect's refusal to answer certain questions is not tantamount to the invocation, either equivocal or unequivocal, of the constitutional right to remain silent[.]").

Because Gray's voluntary statements about the firearm constituted a waiver of his right to remain silent, those statements are not subject to suppression on the basis of the purported violation of that right.  See Berghuis v. Tompkins, 130 S. Ct. 2250, 2259-64 (2010) (suspect waived his right to silence when he made an uncoerced statement to the police, even though he refused to sign a form acknowledging that he had been read his Miranda rights and remained generally unresponsive to repeated questioning for the first several hours of his interrogation).  See also id. at 2261 (quoting North Carolina v. Butler, 441 U.S. 369, 373, 376 (1979) ("An 'implicit waiver' of the 'right to remain silent' is sufficient to admit a suspect's statement into evidence[,]. . . . [and] it is clear that a waiver of Miranda rights may be implied

31

through "the defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver."). Accordingly, it is **RECOMMENDED** that Gray's motion to suppress statements, [Doc. 11], be **DENIED**.

### IV. CONCLUSION

For the foregoing reasons, it is hereby **RECOMMENDED** that Gray's motions to suppress evidence and statements, [Docs. 10 & 11], be **DENIED**.

There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, certified Ready for Trial.

**IT IS SO ORDERED AND RECOMMENDED**, this 31st day of October, 2013.

RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE